**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DOROTHY GAUTREAUX, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case Number: 66 C 1459 |
| | ) | |
| v. | ) | |
| | ) | Hon. Marvin E. Aspen |
| CHICAGO HOUSING AUTHORITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**JOINT MOTION FOR PRELIMINARY APPROVAL OF
CLASS SETTLEMENT**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the class they represent (the "Plaintiffs"), and defendant Chicago Housing Authority ("CHA"), jointly move for an Order granting preliminary approval of the proposed class settlement between the Plaintiffs and the CHA. The proposed settlement terms are memorialized in an executed Settlement Agreement, attached as Exhibit A. The Plaintiffs and the CHA jointly request that this Court approve the proposed settlement terms and form of notice, and allow the Plaintiffs to proceed with class notice as set forth herein. In support of this Motion, the Plaintiffs and the CHA state as follows:

**I.     Introduction**

This extraordinary case is now more than fifty-two years old, and has been actively litigated at the trial and appellate levels. The original complaint in this lawsuit, filed in 1966, alleged that the policies of the CHA with respect to the selection of sites for public housing and for the assignment of tenants were racially discriminatory and violated the class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Sections

1981 and 1983 of the Civil Rights Act of 1964. On March 2, 1967, the District Court certified this case as a class action. On February 10, 1969, the District Court granted summary judgment in favor of the class, and found that the CHA had discriminated "by selecting housing project sites in predominantly black neighborhoods and by using racial quotas to limit the number of blacks in housing projects in predominantly white neighborhoods." The District Court then entered an order on July 1, 1969, "to prohibit the future use and to remedy the past effects of the defendant Chicago Housing Authority's unconstitutional site selection and tenant assignment procedures, . . . and, among other things, ordered CHA to affirmatively administer its public housing system in every respect ... to the end of disestablishing [its] segregated public housing system" (as amended from time to time, the "1969 Judgment Order").

As set forth in the recitals to the Settlement Agreement, which are incorporated herein as if fully set forth, the facts and circumstances that gave rise to the entry of the 1969 Judgment Order have changed significantly, and the parties to this litigation have worked cooperatively to advance the purposes of the 1969 Judgment Order and implement a desegregated public housing program. The parties now agree that, in view of the substantial changes in circumstances that have occurred since the Court entered the 1969 Judgment Order, that the Order should be vacated and replaced with the proposed Settlement Agreement.

## II.    Terms of the Proposed Settlement.

The Settlement Agreement provides that: (1) the CHA will complete a Development Plan that is attached as an exhibit to the Settlement Agreement; (2) the CHA will limit its development of non-elderly units unless, subject to certain exceptions, those units are in a General or Opportunity Area, as those terms are defined in the Agreement; (3) the Plaintiffs, through Class Counsel, will have the right to propose reasonable changes to the way in which CHA administers

its Housing Choice Voucher program; and (4) CHA will coordinate efforts to implement early learning program initiatives, in conjunction with appropriate community partners, at its Dearborn, Lake Parc Place-Washington Park, Trumbull and Wentworth public housing developments. During the term of the Settlement Agreement, the CHA will meet quarterly with the Class Counsel regarding CHA compliance with the terms of the Agreement and produce certain reports and data to class counsel, as described in the Agreement.

Under the terms of the Settlement Agreement, the 1969 Judgment Order will be terminated. The Settlement Agreement resolves all discrimination claims against Defendants. The Plaintiffs and the class they represent will release, relinquish, and discharge all claims against the Defendants with respect to the discrimination claims brought in this action, reserving, however, the right to enforce the Settlement Agreement. The Settlement Agreement also provides for attorneys' fees. The Agreement will terminate on July 31, 2024.

## III.    Notice and Administration

Plaintiffs and the CHA propose that on December 31, 2018, CHA shall cause an official Notice, as approved by the Court, to be mailed and/or hand-delivered to the mailing address of each tenant residing in CHA public housing units, and to be provided electronically to each applicant on the CHA's public housing site-based waitlist. The proposed form of Notice is attached hereto as Exhibit B.

Plaintiffs and the CHA further propose that on December 31, 2018, Class Counsel shall cause the Notice to be published in one edition of the *Chicago Tribune* and one edition of the *Chicago Sun-Times*.

Following entry of the order of preliminary approval, Plaintiffs and the CHA propose that Class Counsel and the CHA add a page to their respective websites for purposes of publishing the

court-approved official Notice, the proposed Settlement Agreement, and information regarding the submission of inquiries and correspondence regarding the Settlement. Class Counsel and the CHA shall also provide a telephone number for inquiries regarding the Settlement, and maintain records of all inquiries and correspondence.

## IV.    Argument

### A.    The Settlement Approval Process

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

(1)    Preliminary approval of the proposed settlement at an informal hearing;

(2)    Dissemination of mailed and/or published notice of the settlement to all affected class members; and

(3)    A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and

argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in this Circuit and endorsed by *Newberg*, safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. 4 *Newberg* § 11.25. By this joint motion, the parties request that the Court take the first step in the settlement approval process by granting preliminary approval of the proposed Settlement. The purpose of the preliminary evaluation of the settlement agreement is to determine whether the agreement is "within the range of possible approval." *Armstrong*, 616 F.2d at 314. When determining whether a settlement is fair, adequate, and reasonable at the final approval stage, courts in this Circuit consider the following factors:

(1)    the strength of plaintiffs' case compared to the terms of the proposed settlement;

(2)    the likely complexity, length, and expense of continued litigation;

(3)    the amount of opposition to settlement among affected parties;

(4)    the opinion of competent counsel; and

(5)    the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199; *see also Kaufman v. American Express*, 877 F.3d 286 (7th Cir. 2017); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002); *In re: Southwest Vouchers Litigation*, 799 F.3d 701 (7th Cir. 2015). In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Isby*, 75 F.3d at 1199.

Granting preliminary approval of this Settlement will allow the Plaintiff Class to receive notice of the proposed Settlement's terms and the date and time of the final fairness hearing, at which Class members may voice approval of or opposition to the Settlement, and at which the

parties and Class members may present further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement. *See Manual for Compl. Lit.*, at §§ 13.14, 21.632.

**B.      The Proposed Settlement is Well Within the "Range of Possible Approval" for Preliminary Approval.**

Plaintiffs and CHA respectfully submit that the Settlement meets all of the factors relevant to final settlement approval, and, as such, the Settlement should be preliminarily approved.

**1.      The Strength of Plaintiffs' Case Compared to the Terms of the Proposed Settlement**

Plaintiffs achieved the original relief sought in their Complaint almost fifty years ago.  As set forth in the Recitals to the Settlement Agreement, the circumstances existing at the time of the entry of the Judgment Order have changed significantly.  The discriminatory tenant assignment practices described by the District Court in 1969 are no longer employed and have been replaced by procedures and practices that are fair, impartial, and race-neutral.  Likewise, the discriminatory site selection procedures described the District Court in 1969 are no longer employed and have been replaced by procedures and practices that are race-neutral.  As compared with 1969, public housing is more dispersed across the City of Chicago and is less concentrated in a few highly segregated areas.  At the same time, views have evolved as to how to effectively address segregated public housing patterns, as the Court of Appeals has noted. *See Gautreaux v. CHA*, 491 F.2d 649, 657 (7th Cir. 2007).  The CHA is today possessed of a multitude of programs and funding sources (such as private lending) that did not exist in 1969, and that are used not only to build new hard units, but also to provide tenant subsidies in the private market, including portable subsidies not tied to any particular development or building.

Against this backdrop of the current status of Plaintiff's case, the terms of the Settlement Agreement require CHA to take several affirmative actions (including the implementation of the

Development Plan and the coordination of early learning program initiatives), places certain limitations on CHA's development of non-elderly units, provides Plaintiffs with the opportunity to propose changes to the Housing Choice Voucher program, and imposes reporting obligations on CHA. These requirements will further the goals of the original 1969 Judgment Order, while at the same time bring finality to the dispute between the parties. In light of changed circumstances detailed above and the terms of the proposed Settlement Agreement, the parties agree that it is in the best interests of the Plaintiff Class that the Judgment 1969 Judgment Order be vacated and replaced with the proposed Settlement Agreement.

### 2. Continued Litigation is Likely to Take Several More Years.

Continued litigation would likely extend this case for several years beyond the proposed termination date of the Settlement Agreement, requiring additional Court resources as well as additional attorneys' fees for counsel representing both plaintiffs and the Defendant, all to be paid by the CHA. As a result, funds that might be used by the CHA for other housing initiatives and programs are instead being expended for attorneys' fees. By resolving all of the issues between the parties on an agreed upon timeline, the proposed Settlement will conserve the Court's time and allow the CHA to apply funds it is currently using to pay attorneys' fees to other budget priorities central to its mission.

### 3. There is Currently No Opposition to the Settlement.

The parties favor settlement. But because notice has not yet been sent to the Class, this factor cannot be fully evaluated prior to the final fairness hearing.

### 4. Class Counsel Endorse the Settlement.

Class Counsel endorse this Settlement. The opinion of Class Counsel on the Settlement is entitled to considerable weight, particularly because: (1) Class Counsel are well qualified and

experienced in class action litigation; (2) Class Counsel have been actively involved in the prosecution of the action since 1966, and (3) the Settlement was reached at arm's length through negotiations by experienced counsel. This factor therefore weighs in favor of preliminary approval. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

### 5. The Late Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval.

This case has been vigorously litigated since 1966. The extremely advanced stage of the proceedings demonstrates that Class Counsel possess all the information necessary to properly evaluate the case and they now confirm that the Settlement is, in their estimation, fair, reasonable, and adequate.

### C. The Proposed Notice Program is Constitutionally Sound

"Rule 23(e)(l)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(l), (b)(2), or (b)(3)." *Manual for Compl. Lit.*, supra, at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). According to the *Manual, supra*, at § 21.312, the settlement notice should (to the extent relevant here) do the following:

- Define the class;

- Describe clearly the options open to the class members and the deadlines for taking action;

- Describe the essential terms of the proposed settlement;

- Disclose any special benefits provided to the class representatives;

- Provide information regarding attorneys' fees;

- Indicate the time and place of the hearing to consider approval of the settlement; and

- Prominently display the address and phone number of class counsel and the procedure for making inquiries.

The proposed form of Notice, attached as Exhibit B hereto, and the Notice plan, satisfy all of the criteria above. The Notice plan provides for hand delivery for current residents residing in CHA housing, and electronic delivery to applicants on the site-based waitlist. Notice will also be provided to Class members online through the parties' respective websites and by publication in two newspapers.

## V. **CONCLUSION**

For the foregoing reasons, Plaintiffs and the CHA jointly request that the Court enter the proposed form of order preliminarily approving the Settlement, and approving the Notice and Notice plan proposed by the parties. A proposed order is attached to this motion.

Respectfully submitted,

Dated: December 21, 2018

By:      */s/ Alexander Polikoff*
Alexander Polikoff
Julia Elena Brown
Business & Professional People for the
      Public Interest
25 East Washington Street
Suite 1515
Chicago, IL 60602
(312) 641-5570
apolikoff@bpichicago.org

*Counsel for Plaintiffs*

By:      */s/ Cheryl J. Colston*
Cheryl J. Colston

Chicago Housing Authority
Department of Law
60 East Van Buren
12th floor
Chicago, IL 60605
(312)913-7918
CColston@thecha.org

*and*

Thomas Edward Johnson
Johnson, Jones, Snelling & Gilbert
36 South Wabash Street
Suite 1310
Chicago, IL  60603
(312) 578-8100
tjohnson@jjsgd.com

*Counsel for the Chicago Housing Authority*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOROTHY GAUTREAUX, et al.,    )
    )
        Plaintiffs,    )
    )        Case Number: 66 C 1459
    vs.    )
    )        Hon. Marvin E. Aspen
CHICAGO HOUSING AUTHORITY, et al.,    )
    )
        Defendants.    )

## SETTLEMENT AGREEMENT

Subject to court approval, this Settlement Agreement is made by and among the defendant, the Chicago Housing Authority ("CHA"), a municipal corporation, and the plaintiffs, on behalf of themselves and the class they represent.

## RECITALS

WHEREAS, the CHA is an Illinois municipal corporation organized and existing under the provisions of the Housing Authorities Act, 310 ILCS 10/1 et seq.; and

WHEREAS, on August 9, 1966, Plaintiffs Dorothy Gautreaux (now deceased) and other African-Americans who lived in CHA public housing projects or were applicants for public housing filed a complaint in the Northern District Court of Illinois against the CHA and the then-Executive Director of the CHA (the "Gautreaux litigation"); and

WHEREAS, the complaint alleged that the CHA's policies with respect to the selection of sites for public housing and for the assignment of tenants were racially discriminatory and violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Sections 1981 and 1983 of the Civil Rights Act of 1964; and

WHEREAS, on March 2, 1967, the District Court certified the plaintiffs as representatives of a plaintiff class, 265 F. Supp. 582, 583 (N.D. Ill. 1967); and

WHEREAS, on February 10, 1969, the District Court granted summary judgment in favor of the plaintiff class and found that the CHA had discriminated "by selecting housing project sites in predominantly black neighborhoods and by using racial quotas to limit the number of blacks in housing projects in predominantly white neighborhoods," 296 F. Supp. 907, 909, 913-15 (N.D. Ill. 1969); and

WHEREAS, on July 1, 1969, the District Court entered a remedial order "to prohibit the future use and to remedy the past effects of the defendant Chicago Housing Authority's unconstitutional site selection and tenant assignment procedures," 304 F. Supp. 736, 737 (N.D. 1969) (the "Judgment Order"), which Judgment Order, among other things, reflecting federal law,



EXHIBIT

A

enjoined CHA in the operation of its public housing system from "invidious discrimination on the basis of race" and  to affirmatively administer its public housing system "to the end of disestablishing [segregation therein]" (Judgment Order Injunctions"); and

WHEREAS, over the ensuing years, the circumstances existing at the time of the entry of the Judgment Order have changed significantly, including among other changes:

1.  The discriminatory tenant assignment practices described by the District Court in 1969 are no longer employed and have been replaced by procedures and practices that are fair, impartial, and race-neutral, as reflected most recently in the Agreed Order entered by the District Court on February 1, 2018; and

2.  The discriminatory site selection procedures described by the District Court in 1969 are no longer employed and have been replaced by procedures and practices that are race-neutral, as reflected in numerous development orders entered by the District Court over the years; and

3.  The parties' belief and intent that in carrying out this Settlement Agreement CHA will aspire to adhere to the requirements of federal law as reflected in the Judgment Order injunctions; and

4.  As compared with 1969 public housing is more dispersed across the City of Chicago (CHA non-elderly tenants now live in 49 of the City's wards and 74 of the City's 77 Community Areas) and is less concentrated in a few highly segregated areas, although the system cannot yet be said to be desegregated; and

5.  CHA's use of project and tenant-based vouchers ("Housing Choice Vouchers"), which allow low-income families to rent housing in the private market, has grown significantly, so that at present the number of families using such vouchers is larger than the number of public housing residents; and

6.  CHA's mobility counseling program provides assistance to families living in the private market with Housing Choice Vouchers who seek housing in racially diverse, low-poverty areas, but the full potential of the mobility counseling program has in this respect not yet been realized: and

7.  Over the past fifty years, views have evolved as to how to effectively address and ameliorate segregated public housing patterns, as the District Court and the Court of Appeals have noted, *see* 491 F.2d 649, 657 (7th Cir. 2007); and

8.  The CHA is today possessed of a multitude of programs and funding sources (including private lending) that did not exist in 1969, and that are used not only to build new hard units but also to provide tenant subsidies in the private market, including "portable" subsidies not tied to any particular development or building; and

9.  While, in 1969, the CHA built, managed and maintained all of its housing developments and public housing units, those developments and units are now

developed, managed and maintained by private real estate professionals, selected with community and tenant input; and

WHEREAS, in the 1990's, the CHA launched plans to overhaul its public housing developments, and these plans considered the changed circumstances from 1969 and incorporated new policy insights on public housing, set forth in the CHA's 2000 Plan for Transformation ("Plan for Transformation") and the 2013 Plan Forward: Communities that Work ("Plan Forward"); and

WHEREAS, the Plan for Transformation outlined how the CHA, through agreements with and funding from the U.S. Department of Housing and Urban Development ("HUD"), proposed to transform public housing in Chicago by proceeding on a number of fronts, including, among others, demolition of upwards of 18,000 obsolete housing units; replacement of all of Chicago's high-rise public housing projects with lower density, mixed-income and rehabilitated developments; rehabilitation and redevelopment of about 25,000 units of public housing; providing residents with increased opportunities for self-sufficiency; and improving the administration of the Housing Choice Voucher program; and

WHEREAS, the Plan Forward, adopted by the CHA in January 2013, expanded on the foundation laid by the Plan for Transformation by setting forth a new strategic plan defined by the following goals: coordinating public and private investments to develop vibrant communities; increasing the number of affordable housing opportunities within Chicago; ensuring that every housing unit is safe, decent and sustainable; and expanding services to more residents, including families living in private market housing with Housing Choice Vouchers; continuing programs providing mobility counseling for families seeking to move out of high-poverty, racially segregated areas, and outreaching to all families about the importance of early childhood learning; and

WHEREAS, the CHA, in partnership with the City of Chicago, developers and non-profit partners, has made considerable progress in implementing the Plan for Transformation and Plan Forward, including the demolition of thousands of dilapidated public housing units and the construction or rehabilitation of more than 24,000 public housing units and the issuance and administration of more than 45,000 Housing Choice Vouchers; and

WHEREAS, notwithstanding such progress, work remains to be done to achieve in full the ambitious goals of the *Plan for Transformation* and *Plan Forward*; and

WHEREAS, the replacement of the dilapidated CHA developments with mixed-income communities and a variety of retail and community assets has stimulated economic development and renewal in communities they anchor, and has resulted in jobs and services that assist in the creation of sustainable neighborhoods; and

WHEREAS, over the past many years the parties have worked cooperatively and diligently to advance the purposes of the Judgment Order and implement a desegregated public housing program, including by entering numerous orders modifying the Judgment Order; and

WHEREAS, the parties agree that the institutional racial animus that prompted this case is not apparent with respect to this case any longer, but agree that the plaintiffs suffered as a result

of CHA's past practices, and understand that future race discrimination in public housing is prohibited by the laws of the United States; and

WHEREAS, the parties agree that, in view of these and other substantial changes in circumstances that have occurred since entry of the Judgment Order, that the Judgment Order should be vacated and replaced with this Settlement Agreement:

**NOW, THEREFORE**, in consideration of the mutual undertakings set forth in this Agreement, and intending to be legally bound hereby, the parties agree as follows:

## I.      Definitions

As used in this Agreement the following capitalized terms have the meanings specified below:

"Action" means *Gautreaux v CHA*, Case No. 66-cv-1459 (N.D.Ill.) (Aspen, J.); which is currently pending in the U.S. District Court for the Northern District of Illinois.

"Affordable Housing" means tax-credit financed and other non-public housing that is available to families earning less than 60% of the area median income, or based on allowable income averaging, those families eligible for such housing under the Internal Revenue Code.

"Annual Contributions Contract" has the meaning set forth in 24 CFR Part 982.

"Binding written agreements" means contracts for redevelopment, long-term leases, or other similar documents that set forth the development agreements between CHA and its developers.

"CHA unit" means a hard housing unit for which CHA provides a specific subsidy, whether CHA leases or owns the unit, not including subsidies provided through the Housing Choice Voucher program.

"Development Plan" means the plan for developing public housing units, as set forth on Exhibit A hereto.

"Dismissal Date" means the date, following a fairness hearing and final approval of this Settlement Agreement, that this Court dismisses this case.

"Elderly public housing units" means CHA public housing units specifically set aside for persons sixty-two years of age and older, or as allowed under CHA's Senior Designated Plan.

"Final" means, with respect to any order of a court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise. An order becomes "Final" when: (i) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (ii) an appeal has been filed and either (a) the appeal has been

4

dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (b) the order has been affirmed in its entirety and the prescribed time, if any, for commencing any further appeal has expired. For purpose of this paragraph, an "appeal" includes appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of certiorari or mandamus, and any other proceedings of like kind.

"Final Approval Order" means the Court's approval of the Settlement following preliminary approval thereof, notice to the Class and a hearing on the fairness of the Settlement.

"General Area" has the meaning given the term "General Public Housing Area" in the 1969 Judgment Order, found at 304 F.Supp. 736, 737 (ND Ill. 1969). Such areas shall be identified by agreement of the parties, using the most recently available census data and, in the absence of the parties' agreement, by the Court.

"Housing Choice Voucher" or "HCV" has the meaning set forth in 24 CFR Part 982.

"Judgment Order" means the order entered by the Court on July 1, 1969, as described in the Recitals and as amended or modified from time to time.

"Limited Area" has the meaning given the term "Limited Public Housing Area" in the 1969 Judgment Order, found at 304 F.Supp. 736, 737 (ND Ill. 1969). Such areas shall be identified by agreement of the parties, using the most currently available census data and, in the absence of the parties' agreement, by the Court.

"Market rate for-sale unit" means a unit offered for sale that is not restricted to a buyer of a certain income.

"Market rate rental unit" means an apartment offered for rent that is not restricted to a tenant of a certain income.

"Mixed-income developments or buildings" means a development or a building containing not only non-elderly CHA families but also affordable and/or market rate rental and/or market rate for-sale units.

"Opportunity Area" shall include those areas identified on the map that is attached hereto as Exhibit B, as well as in any future amendment of such map, as agreed to by the parties, or in the absence of agreement, as approved by the Court.

"Project-Based Vouchers" or "PBV" shall have the meaning set forth in 24 CFR Part 983.

"Property Rental Assistance" or "PRA" means the Property Rental Assistance Program established by CHA.

"Rental Assistance Program" or "RAD" means the Rental Assistance Demonstration Program established by HUD, which is part of its Project-Based Voucher program.

"Revitalizing Order" means an order entered by this Court declaring a particular geographic area of the city that was formerly a Limited Area, to be an area with specific evidence of investment and demographic patterns such that there is a likelihood the area will become economically and racially integrated, and which order is referred to, by its terms, as a revitalizing order.

"Scattered-site unit" means a non-elderly CHA unit owned by CHA that is not part of a traditional CHA development.

"Supportive Housing units" means public housing units developed, leased, acquired or supported by CHA that meet the needs of particularly vulnerable populations and are tied to services for those populations, including the homeless or those at risk of becoming homeless, and those facing serious, persistent challenges to a successful life such as alcohol abuse, substance use, mental illness or HIV/AIDS. Populations served may also include persons with developmental disabilities or the frail elderly.

"Traditional CHA unit" means a non-elderly CHA unit that is not a scattered site unit, a PBV unit or located in a mixed income development.

## II.     CHA Development Plan that is Exhibit A Hereto

A.      The parties agree that the CHA shall complete the various requirements set forth in the Development Plan that is attached hereto as Exhibit A. The parties agree that the deadlines set forth in Exhibit A and in the plans described in Exhibit A are projected dates and plans, and may change on account of the exigencies of development, including the availability of federal, state and local financing, and the condition of the housing market. The CHA reserves the right to modify such dates and such plans until the expiration of this Settlement Agreement, but only with the consent of the plaintiffs (without approval of the Court) or, in the absence of consent, the approval of the Court.

B.      During the term of this Settlement Agreement, non-elderly CHA units in the mixed-income buildings and developments described in the Development Plan must be developed and occupied substantially simultaneously with non-CHA units.

C.      During the term of this Settlement Agreement, non-elderly CHA units in the mixed-income buildings and developments described in the Development Plan  must be dispersed throughout the building or development, with no clustering or stacking of public housing units.

## III.    Limitation on CHA's Development of PBV, Scattered-Site, Traditional and Elderly Housing

A.      During the term of this Settlement Agreement, the CHA agrees not to obligate funds for development, acquisition or lease of non-elderly CHA units unless those units are in a General or Opportunity Area or are developed in accordance with the Development Plan attached as Exhibit A hereto, with the following exceptions:

1.      CHA may obligate funds for the purpose of preserving existing, subsidized elderly or non-elderly CHA units for which an alternative subsidy is no

longer available and failure to provide the subsidy will result in the eviction or displacement of current tenants.

2.  CHA may obligate funds for supportive housing, so long as supportive housing units comprise no more than 20% of CHA's non-elderly CHA units.

3.  CHA may obligate up to 50% of its available development funds for non-elderly CHA units outside the General or Opportunity Areas of the city, once 50% of non-elderly CHA units (other than those units identified in the Development Plan that is attached hereto as Exhibit A) are located in General or Opportunity Areas; provided however, that CHA may obligate funds and develop non-elderly CHA units located outside the General and Opportunity Areas with the agreement of the plaintiffs (without approval of the Court) or, in the absence of such agreement, the approval of the Court.

4.  Project-based voucher units cannot be counted in determining whether CHA has satisfied the standard set forth in Section III(A)(3) of this Agreement, unless they are under contract for twenty years or more.

5.  Non-elderly CHA units used to "match" prior units under prior orders of this Court, requiring CHA to acquire, lease or develop units in General and Opportunity Areas shall be counted in determining whether CHA has satisfied the standard set forth in Section III(A)(3) of this Agreement.

6.  If CHA has not satisfied the standard set forth in Section III(A)(3) of this Agreement, the CHA may nonetheless acquire, lease or develop units in Limited Areas of the city with the agreement of the plaintiffs (without approval of the Court) or, in the absence of such agreement, the approval of the Court.

B.  During the term of this Settlement Agreement, CHA shall not develop, acquire or lease elderly public housing units, other than as permitted by Sections III(A)(1) and (2) of this Settlement Agreement, or with the consent of the plaintiffs (without approval of the Court), or in the absence of such consent, the approval of the Court.

C.  During the term of this Settlement Agreement, CHA shall not undertake the substantial rehabilitation of vacant non-elderly CHA buildings in a Limited Area without the agreement of the plaintiffs (without approval of the Court) or, in the absence of such agreement, approval of the Court. Notwithstanding this provision, CHA retains the right to repair and rehabilitate existing elderly and non-elderly CHA units that are not vacant or are vacant only because of tenant turnover, fire, flooding, building system failures, or other condition that makes the unit (otherwise in service) temporarily non-habitable.

D.  During the term of this Settlement Agreement, non-elderly CHA units in mixed-income buildings and developments must be developed and occupied substantially simultaneously with non-CHA units.

7

E.     During the term of this Settlement Agreement, non-elderly CHA units in mixed-income buildings and developments must be dispersed across the building or development, with no clustering or stacking of CHA units.

F.     During the term of this Settlement Agreement, CHA will not concentrate large numbers of non-elderly CHA units (excluding those units identified in Sections II and III(A)(1) and (2) above). Specifically:

1.     In mixed-income developments or buildings that are in General or Opportunity Areas, no more than 50% of the residential units shall be CHA units.

2.     In mixed-income developments or buildings that are outside General or Opportunity Areas, no more than 30% of the residential units shall be CHA units.

3.     Non-elderly CHA units may be 100% of a development or building, whether in a General, Opportunity or Limited Area, if such development or building has no more than thirty residential units.

## IV.     CHA's Site-Based Wait List

During the term of this Settlement Agreement, the CHA will comply with all of the provisions of this Court's order of February 1, 2018, incorporated herein by reference, authorizing the CHA's site-based wait list program, including the reporting and assessment provisions, and the Court will retain jurisdiction to enforce such order.

## V.     CHA's Housing Choice Voucher Program

A.     The parties agree that research now compellingly demonstrates that moving to lower poverty, racially diverse areas brings substantial life-outcome benefits to both children and adults. One goal of this Settlement Agreement is to identify goals and requirements respecting the administration of CHA's Housing Choice Voucher (HCV) Program that have the potential to increase the number of families using CHA vouchers who are realistically able to choose to move into such areas.

B.     To that end, CHA shall promptly engage in discussions with plaintiffs' counsel about the following matters:

1.     Identification of so-called "mobility areas."

2.     Information provided to voucher families about the benefits of moving to mobility areas, and about the assistance and services available from CHA and/or contractor(s) designed to foster such moves.

3.     Efforts to expand mobility area landlord participation in the HCV program, including but not limited to bonus payments, exception rents, administration of the rental process, unit inspections, and lease provisions.

4. Administration of the HCV program, including but not limited to payment standards, targeted vouchers, and funding availability and adequacy.

C. If, after discussion of any such matter has been completed, or upon the expiration of a reasonable time, plaintiffs' counsel conclude that CHA is unwilling to adopt a proposal that would help achieve the goal set out in paragraph A. above, plaintiffs' counsel shall be free to bring such proposal before this Court, and this Court shall have jurisdiction to hear and take action with respect thereto, upon a showing by plaintiffs' counsel that:

1. Adoption of the proposal is likely to increase the number of families who are realistically able to choose to move into lower poverty, racially diverse areas;

2. The proposal is within CHA's power to implement; and

3. CHA's unwillingness to adopt the proposal is arbitrary and capricious. In interpreting what is arbitrary and capricious, the Court shall consider, among other things, whether adopting plaintiffs' proposal would be reasonable and whether CHA's refusal to adopt plaintiffs' proposal would be unreasonable.

D. Once the Settlement Agreement has expired, the provisions of this paragraph IV shall no longer be in effect.

## VI. **Early Learning Initiatives**

A. During the term of this Settlement Agreement, the CHA agrees that it will designate CHA staff or a CHA-paid consultant to coordinate efforts to implement early learning program initiatives, in conjunction with appropriate community partners, at its Lake Parc Place-Washington Park, Dearborn, Trumbull and Wentworth public housing developments.

B. These early learning initiatives shall be modeled on the Altgeld Early Leaning Initiative that is currently in place at CHA's Altgeld Gardens public housing development. While each development's early learning program may vary according to specific needs at each location and the resources available in each community, the CHA will strive to adopt the principal goals and program components of the Altgeld Early Learning Initiative at each site.

C. These early learning initiatives will be available to CHA residents at each of these developments without cost.

## VII. **Monitoring and Reporting**

In order to ensure that the plaintiffs are realistically able to monitor CHA's compliance with the terms of this Settlement Agreement, the parties agree that:

9

A. During the term of this Agreement, CHA shall meet quarterly with plaintiff class counsel regarding CHA's compliance with the terms of this Agreement. Prior to the initial meeting, CHA shall produce for plaintiff class counsel:

1. A report from CHA's Yardi system that identifies the address of each of the non-elderly CHA units identified in Section III(A) of this Agreement, indicating whether such unit is located in a Limited, General or Opportunity Area and, if such unit is a project-based voucher unit, the term of the contract governing that unit, together with a total number of CHA units and the percentage of such units located in General and Opportunity Areas;

2. A report from CHA's Yardi system that identifies the number of non-elderly CHA supportive housing units and the total number of non-elderly CHA units;

3. A report from CHA's Development staff identifying new units (market, affordable and non-elderly CHA units) planned or under construction at each of the sites described in the Development Plan;

4. A report from CHA's Development staff identifying new mixed-income or 100% public housing buildings, not described in the Development Plan that are planned or under construction, including the number of non-elderly CHA units and the total number of units in such buildings;

5. A report containing a list of Contracts for Redevelopment currently executed by CHA with a description of each such contract that includes the parties to the contract, the location covered, the date and term of the contract, the number of CHA units covered, the total number of units covered, and any dates for completion of those units;

6. A report containing a list of long term land leases currently executed by CHA with a description of each such lease that includes the parties to the lease, the location covered, the date and term of the lease and if applicable, the number of CHA units covered, the total number of units covered, and any dates for completion of those units;

7. A report on the Altgeld matching program, as has been produced on a monthly basis pursuant to the Altgeld Gardens Order of January 29, 2015.

B. During subsequent quarterly meetings with plaintiff class counsel, the reports set forth in Section VII(A) above shall be updated to reflect any changes that may have occurred since the preceding meeting.

C. During the term of this Agreement, plaintiff class counsel may continue to attend working group meetings at each development, security meetings at developments, and the PRA evaluation team meetings, so long as such meetings continue.

## VIII. Court Approval of This Settlement Agreement

On or before December 21, 2018, the parties shall jointly submit this Settlement Agreement to this Court and shall move for entry of an order ("Preliminary Approval Order") requesting, among other things, that the Court find and determine:

A. That the Settlement Agreement is fair, reasonable and adequate and preliminarily approve the same. (The motion shall include the proposed form of an order preliminarily approving the Settlement Agreement.)

B. That the proposed form of class notice is approved. (The motion shall include the proposed form of class notice.)

C. That plaintiffs' counsel and the CHA shall provide notice to the class in the form and manner set out in the order, and that notice in such form and manner is reasonable, constitutes the best notice practical under the circumstances, and complies with the requirements of Rule 23 of the Federal Rules of Civil Procedure.

D. That a fairness hearing shall be held on January 17, 2019, to determine whether the Settlement Agreement should be finally approved as fair, reasonable, and adequate, and whether a final order approving the same should be entered pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## IX. Retention of Jurisdiction and Vacation of Judgment Order

The parties agree that the Court shall retain jurisdiction over the Settlement Agreement to enforce the undertakings of the parties set forth therein, and that, at the conclusion of a fairness hearing, they will jointly move the Court for an order of final approval of the Settlement Agreement that contains such a retention of jurisdiction. The parties further agree that, conditional upon the entry of such an order of final approval and retention of jurisdiction:

A. Upon the effective date of this Settlement Agreement, the Judgment Order shall be vacated and the Action dismissed, in accordance with Rule 60(b)(5) of the Federal Rules of Civil Procedure, as applying the Judgment Order prospectively will then no longer be equitable, except that the Orders set out in Paragraph B., below, shall continue in effect.

B. The following orders of this Court, notwithstanding said vacation, shall remain in effect and the Court shall retain jurisdiction to enforce said orders:

1. The Cabrini Orders of September 16, 2015 and September 24, 2015, as described in Paragraph X.B., below;

2. The Site-based Wait List Order of February 1, 2018, which shall remain in effect during the term of the Settlement Agreement;

3. The Order of April 10, 1972, setting aside the application of Chapter 67-1/2, Section 9 of the Illinois Revised Statutes to CHA's actions.

**X.    Effective Date and Termination**

A.    This Settlement Agreement shall be effective (the "Effective Date") upon the earliest to occur of the following:

1.    If no valid objection is filed at the fairness hearing, when a final order of approval and retention of jurisdiction is entered by this Court.

2.    If a valid objection is filed at the fairness hearing and a final order of approval and retention of jurisdiction is nonetheless entered by this Court but no appeal from such order is thereafter filed, when the time for the filing an appeal from such order expires.

3.    If an appeal from a final order of approval and retention of jurisdiction entered by this Court is filed, when such appeal has been finally denied or dismissed.

B.    This Settlement Agreement shall remain in effect until July 31, 2024, whereupon it shall Terminate (the "Termination Date"), subject to the following:

1.    Such termination will occur whether or not the Defendant has complied with the construction dates set forth in the Development Plan. However, if the Defendant has not completed by July 31, 2024 its obligations to develop plans or enter into binding legal agreements required by the Development Plan with respect to any particular development, the parties shall agree to an extension of such date or dates with respect solely to that development and, in the absence of such agreement, the Court shall set such extended date or dates. The termination date of July 31, 2024 will then be extended, but only with respect to such development, to reflect the parties' agreement or the Court's order.

2.    If, prior to July 31, 2024, litigation under the Settlement Agreement has commenced and remains unresolved on July 31, 2024, the provisions of the Settlement Agreement relating solely to the litigated matter shall continue in effect until the final resolution of such litigation.

3.    Notwithstanding the foregoing, the plaintiffs and the Cabrini Local Advisory Council shall have the right to seek enforcement of the terms of the Order of this Court (to which they are parties) dated September 16, 2015, as amended on September 24, 2015, relating to the redevelopment at and surrounding the former Cabrini-Green development, until completion of the redevelopment provided for in those orders, even if the completion of such redevelopment post-dates the termination of this Settlement Agreement.

**XI.    Fees**

A.    The parties agree that neither the execution of this Settlement Agreement, the Court's approval thereof, nor the vacation of the Judgment Order pursuant hereto shall preclude

plaintiffs' counsel from seeking this Court's approval of fees for services performed in connection with the monitoring and enforcement of the Judgment Order for the period prior to its vacation, and that the Court shall retain jurisdiction to consider and act upon any such fee application.

B. The parties agree that plaintiffs' counsel shall be free to seek Court approval of fees for their services performed in connection with reaching agreement upon and obtaining Court approval of this Settlement Agreement, including without limitation the fairness hearing relating thereto, and that the Court shall similarly retain jurisdiction to consider and act upon any such fee application.

C. The parties agree that plaintiffs' counsel shall be free to seek Court approval of fees for their services performed in connection with the monitoring and enforcement of this Settlement Agreement, and that the Court shall likewise retain jurisdiction to consider and act upon any such fee application.

D. The parties may enter into discussions and agree on the amount of fees to be paid under Paragraphs A, B and C, above, but all such fee agreements shall be approved by the Court.

E. CHA agrees that plaintiffs' counsel shall be entitled to receive fees for such services as approved by the Court, but nothing in this paragraph XI shall preclude CHA from objecting to any such fee applications as excessive, duplicative, or upon any other like ground. The parties agree that this Court's retention of jurisdiction under this paragraph XI shall not be affected by, and shall survive the Termination Date of, the Settlement Agreement.

## XII. **Miscellaneous**

A. This Settlement Agreement shall not be modified, and no waiver of any rights conferred hereunder shall be effective, except by a writing executed by the parties. The parties agree that the terms of this Settlement Agreement were negotiated in good faith and reflect an agreement reached voluntarily by them.

B. The dismissal of this Action shall be conditioned on the occurrence of the following events:

1. The Court has finally approved the Settlement as described herein, following notice to the Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and has entered the Judgment, if no such appeal is filed and the Judgment has become Final; or

2. If an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible.

C. Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the Settlement shall be admissible in

13

any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Defendant may file this Agreement and/or the Judgment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim. The limitations described in this paragraph apply whether or not the Court enters the Preliminary Approval Order, the Final Approval Order, or the Judgment.

      D.      This Agreement shall be binding upon, and inure to the benefit of, the successors of the parties hereto. Without limiting the generality of the foregoing, each and every covenant and agreement herein by Class Plaintiffs and plaintiff class counsel shall be binding upon all Class Members.

      E.      The undersigned representatives of Defendant represent that they are fully authorized to enter into and to execute this Agreement on behalf of Defendant. Plaintiff class counsel, on behalf of the plaintiff class, represent that they are, subject to Court approval, expressly authorized to take all action required or permitted to be taken by or on behalf of this Class pursuant to this Agreement to effectuate its terms and to enter into and execute this Agreement and any modifications or amendments to the Agreement on behalf of the plaintiff class that they deem appropriate.

      F.      None of the parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

      G.      This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be on and the same instrument. Counsel for the parties to this Agreement shall exchange among themselves original signed counterparts and a complete set of executed counterparts shall be filed with the Court.

      IN WITNESS WHEREOF, the parties hereto, through their fully authorized representatives, have executed this Agreement as of this 21st day of December, 2018.


_____            _____

Alexander L. Polikoff                James L. Bebley

*On Behalf of Plaintiffs*              *On Behalf of the Chicago Housing Authority*

**EXHIBIT A**

## DEVELOPMENT PLAN

### I.    ABLA – ROOSEVELT SQUARE

The redevelopment of the site formerly known as ABLA Homes (consisting of Jane Addams Homes, Robert Brooks Homes, Loomis Courts and Grace Abbot Homes) ("ABLA") and now sometimes referred to as Roosevelt Square is currently governed by the Orders entered in the *Gautreaux* Litigation (as defined in the Settlement Agreement) on June 19, 1998 and August 16, 2005 (the "ABLA Orders"). The ABLA Orders designate the ABLA site as a revitalizing area and authorize the CHA to develop approximately 1,084 non-elderly public housing units as part of an overall development. The CHA has also approved the Greater Roosevelt Square Planning for the Future: Master Plan Framework Report ("Roosevelt Square Master Plan"). The Roosevelt Square Master Plan, among other things, retains the goal of developing 1,084 public housing units but permits up to an additional 500 market rate housing units in Roosevelt Square.

The parties agree that the redevelopment of the ABLA/Roosevelt Square site shall be completed as set forth below, notwithstanding any conflicting provisions in the ABLA Orders or Roosevelt Square Master Plan, which conflicting provisions are hereby superseded and replaced.

### A.    Total Public Housing Units.

The CHA shall undertake the development of an additional 509 non-elderly CHA units in the area described below in Section I.B, for a total of 1210 non-elderly CHA units in such area. The 1210 CHA units shall include the 245 non-elderly CHA units already constructed as part of the Roosevelt Square mixed income development, the 126 CHA units in Loomis Courts, and the 330 CHA units in Brooks Homes. The CHA will enter into binding written agreements on or

1

before December 31, 2023 providing for the development of the additional 509 non-elderly CHA units.

### B.    Permitted Development Area

The 509 non-elderly CHA units described in Section I.A may be constructed in the Revitalizing Area established in the ABLA Revitalizing Order of June 19, 1998 or within one-half mile of such Revitalizing Area.

### C.    Income Mix

#### 1.    Public housing

The 1210 non-elderly CHA units to be developed pursuant to this Section I shall account for no less than 32 percent nor more than 37 percent of the total residential units developed pursuant to this Agreement.

#### 2.    Affordable housing

The affordable housing units to be developed pursuant to this Agreement or already constructed shall account for no less than 25 percent nor more than 30 percent of the total residential units.

#### 3.    Market Rate/For Sale

The remainder of the housing to be developed pursuant to this Agreement shall be "market rate rental" or "market rate for sale" housing.

#### 4.    No Obligation for Income Tiering

The income tiering requirements contained in the ABLA Orders is eliminated for current and future CHA units.

## II. Altgeld Gardens

The development known as Altgeld Gardens is currently governed by the order entered on January 29, 2015 in the *Gautreaux* litigation (the "Altgeld Gardens Order"). Pursuant to the terms of that Order, the CHA agreed to implement certain community and building improvements, demolish certain public housing units, engage in quarterly discussions with BPI regarding the security and safety of residents, and rehabilitate certain other public housing units, including 218 residential units in Blocks 7 and 8 of Altgeld Gardens. CHA agreed to match those 218 units with units it acquires or develops in General Areas or Opportunity Areas. The matching units can be non-elderly CHA units or units provided through the mobility counseling demonstration program, as described in the Altgeld Gardens Order. The CHA also approved on September 30, 2013 a master plan for Altgeld Gardens (the "Altgeld Master Plan").

The parties agree that CHA's obligations under the Altgeld Gardens Order shall be completed as set forth below, notwithstanding any conflicting provisions in the Altgeld Gardens Order or Altgeld Master Plan, which conflicting provisions are hereby superseded and replaced.

### A. Completion of Matching Program

The CHA shall complete by December 31, 2019, the matching unit program provided for in the Altgeld Gardens Order.

### B. Altgeld Library/Childcare Center

The CHA shall complete by December 31, 2020, the new Altgeld Library/Childcare Center.

### C. CYC Building, Gautreaux Childcare Center, and Carver Park Fieldhouse

The CHA shall establish, on or before December 31, 2020, a timeline agreeable to Class Counsel setting forth specific dates for the completion of the rehabilitation of the CYC Community Center, the Gautreaux Childcare Center, and the Carver Park Fieldhouse.

**D.** **Carver Park**

The CHA, together with appropriate other parties, shall, by December 31, 2020, develop a detailed plan (including a timeline setting forth specific dates) agreeable to Class Counsel for the revitalization of the outdoor space at Carver Park, as well as the creation or improvement of bike paths, sidewalks and streets contemplated by the Altgeld Master Plan. The CHA shall complete such revitalization and improvement plan by December 31, 2023.

**E.** **Security Updates**

The CHA shall, until December 31, 2023, continue to meet quarterly with Class Counsel for the purpose of providing comprehensive updates on the security situation at Altgeld Gardens.

**III.** **Cabrini-Green**

The redevelopment on the site formerly occupied by the Cabrini-Green Homes is currently governed by numerous orders and decisions in both the *Gautreaux* Litigation and the case known as *Cabrini Green Local Advisory Council v. Chicago Housing Authority, et al*, 96 C 6949. The final development requirements for the Cabrini on-site and off-site parcels have been determined and set forth in the orders entered September 12, 2000, September 16, 2015 and September 24, 2015 in the *Gautreaux* Litigation. The CHA intends to complete the redevelopment of the Cabrini on-site and off-site parcels in accordance with the terms of these orders, which shall remain in full force and effect after the Court's approval of the Settlement Agreement.

**IV.** **Horner**

The redevelopment on the site formerly occupied by the Henry Horner Homes is currently governed by orders entered in both the *Gautreaux* litigation and the litigation known as

4

*Henry Horner Mother Guild v. CHA*, Case 91 C 3316. The orders entered from 1995 to 1998 in this case related to the Phase 1 development of the "Superblock" (100% non-elderly public housing units). The development authorized by the Phase 1 original "Superblock" orders is complete. The order entered on December 12, 2002 provides for a Phase 2 mixed income development (Westhaven Park), which has been nearly completed. The order entered on November 6, 2014 in this case provides that the CHA must complete the renovation of the 201-unit "Superblock." These orders in this case shall be referred to as "the Horner Orders".

The parties agree that CHA's obligations under the Horner Orders shall be completed as set forth below, notwithstanding any conflicting provisions in the Horner Orders, which conflicting provisions are hereby superseded and replaced.

**A.     Phase 2**

The final parcel of the Phase 2 development of the Horner site includes the construction of 35 non-elderly CHA units, together with 54 affordable and market housing units. The CHA shall close on this final sub-phase of Phase 2 development by December 31, 2020 and commence construction of these final Phase 2 units by March 31, 2021.

**B.     Rehabilitation of Superblock**

The CHA and the developer for the Superblock are currently engaged in the rehabilitation of the Superblock, in accordance with the Horner Orders. The Superblock, as renovated, will consist of 95 non-elderly CHA units, 50 affordable units, and 55 market rate units. The CHA shall complete the renovation by March 31, 2019. The CHA shall acquire or construct the 106 replacement units required under the Horner orders by December 31, 2019.

## V. Ickes

The development on the site of the former Harold Ickes Homes is governed by the revitalizing order entered on December 19, 2018 (the "Ickes Revitalizing Order"). The parties agree that the redevelopment of the Harold Ickes site shall be consistent with the terms of the Ickes Revitalizing Order and as set forth below, notwithstanding any conflicting provisions in the Ickes Revitalizing Order, which conflicting provisions are hereby superseded and replaced.

### A. Development of CHA units

CHA will develop at least 244 CHA units in the Ickes Revitalizing Area, as described in the Ickes Revitalizing Order, along with affordable and market rate units such that CHA units will comprise 28% of the total housing in the Revitalizing Area. The CHA commits that 68 CHA units in Phases 1A and 1B will be completed or under construction by December 31, 2020. CHA will enter into binding written agreements providing for the development of the remaining 176 CHA units by December 31, 2022.

### B. Sale or Lease of Land

If the CHA sells or enters into long-term leases for land in the Ickes Revitalizing Area, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or in the Ickes Revitalizing Area.

### C. Other Uses of Land/Residential Benefit

If the CHA sells or exchanges the land in the Ickes Revitalizing Area for a use other than housing, the CHA shall, in addition to applying funds as provided in Section V.B, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

## VI.   Lakefront Properties

The redevelopment of the Lakefront Properties (which include Lake Park Crescent, Sullivan Station, Jazz on the Boulevard/Drexel, and various scattered site replacement units) is currently governed by the orders of this Court entered on June 3, 1996, April 11, 2000, February 6, 2003, July 14, 2005, and May 31, 2011 (the "Lakefront Orders"). The on-site non-elderly CHA units authorized by the Lakefront Orders have been completed, although the percentage of non-elderly CHA units is greater than that contemplated by the Lakefront Orders. The majority of the off-site scattered replacement units have also been constructed.

The parties agree that CHA's obligations under the Lakefront Orders shall be completed as set forth below, notwithstanding any conflicting provisions in the Lakefront Orders, which conflicting provisions are hereby superseded and replaced.

### A.   Market Rate-For Sale Units in Sullivan Station

The CHA shall complete the construction of 30 market rate for sale units at Sullivan Station on or before December 31, 2022.

### B.   Additional Affordable and Market Rate Housing

The CHA shall enter into binding written agreements on or before December 31, 2023, providing for the development of affordable and market rate housing units on CHA land located at the southern portion of the Lakefront site. The affordable and market rate housing constructed pursuant to this paragraph shall be sufficient to ensure that CHA units do not exceed 25 percent of the total residential units on the Lake Park Crescent/Sullivan Station site.

### C.   No Obligation for Income Tiering

The income tiering requirements for occupancy in CHA units contained in the Lakefront Orders is eliminated.

7

**EXHIBIT A**

**VII.**     **Julia C. Lathrop Homes Public Housing Project**

The redevelopment at Julia C. Lathrop Homes Public Housing Project ("Lathrop") is currently governed by the Order entered December 22, 2016 in the *Gautreaux* Litigation (the "Lathrop Order"). The Lathrop Order provides for the development of 401 non-elderly CHA units on the site of the Lathrop housing project (the "Lathrop on-site development area"), and 524 replacement non-elderly CHA units to be located off-site in General and Opportunity Areas on the North Side of Chicago, as well as 105 elderly CHA units (the "Lathrop off-site development area"), all as described in the Lathrop Order.

The redevelopment of the Lathrop site is occurring in several phases. Phase 1A is currently under construction and includes 151 of the 401 non-elderly CHA units authorized by the Lathrop Order. Phase 1B includes 77 of the 401 authorized units, and the future phase(s) includes 173 of the authorized units. Phase 1B and future phases are in the planning stages and the off-site replacement housing has been partially completed.

The parties agree that CHA's obligations under the Lathrop Order shall be completed as set forth below, notwithstanding any conflicting provisions in the Lathrop Order, which provisions are hereby superseded and replaced.

**A.**     **Phases 1A, 1B and Future Phase(s)**

The CHA shall complete the construction of the 151 CHA units that are part of the Phase 1A development by December 31, 2019. The CHA shall enter into binding written agreements providing for the completion or commencement of construction by December 31, 2020 of 77 non-elderly CHA units in Phase 1B. The CHA shall enter into binding written agreements by December 31, 2021 to implement a plan for the development of the remaining 173 non-elderly CHA units in future phase(s).

8

### B. Off-site development

CHA shall enter into binding written agreements, which may include PRA contracts (with at least a twenty-year commitment), so that by December 31, 2023, the remaining off-site Lathrop replacement non-elderly CHA units required by the Lathrop Order will be completed, under construction or acquired.

## VIII. Lawndale Complex/Ogden Courts

The development on the site of the former Lawndale Gardens development was previously governed by the order entered on August 24, 2010 in the *Gautreaux* litigation (the "Lawndale Order"). The order covered Phase 1 of a 3-phase plan for redevelopment of the Lawndale Gardens development and Ogden Courts, both on site and on nearby land provided through land swaps. Phase 1 was completed in 2012, and all of the units described in the court order have been developed. Phases 2 and 3 have not been developed. The parties agree to complete the remaining phases of development for the Lawndale Complex and Ogden Court sites as set forth below.

### A. Completion of Phases 2 and 3

On or before December 31, 2019, the CHA shall enter into binding written agreements providing for the completion of Phases 2 and 3 of the Lawndale Gardens development and Ogden Court sites, including the construction of 40 non-elderly CHA units in a mixed income setting.

### B. Sale or Lease of Land

If the CHA sells or enters into long-term leases for land on the Lawndale/Ogden Courts site, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA

replacement units in General or Opportunity Areas throughout the City of Chicago or on the Lawndale/Ogden Courts site.

### C. Other Uses of Land/Residential Benefit

If the CHA sells or exchanges the land in the Lawndale/Ogden Courts site for a use other than housing, the CHA shall, in addition to applying funds as provided in Section VIII.B, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

## IX. LeClaire

The parties agree to that the former LeClaire Courts site shall be developed as set forth below.

### A. Development Plan

The CHA shall enter into binding written agreements by December 31, 2022, providing for the redevelopment of the LeClaire Courts site. The development plan will be based upon the proposals selected through the procurement process currently underway, and include a timeline for developing at least 183 long-term PBV units either on the LeClaire Courts site or in combination with off-site units in General Areas or Opportunity Areas. Construction of units will commence by December 31, 2023.

### B. Sale or Lease of Land

If the CHA sells or enters into long-term leases for land in the LeClaire site, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or on the LeClaire site.

### C. Other Uses of Land/Residential Benefit

If the CHA sells or exchanges the land in the LeClaire site for a use other than housing, the CHA shall, in addition to applying funds as provided in Section IX.B., secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

### X. Madden/Wells

The redevelopment of the area formerly known as the Madden/Wells site and now known as Oakwood Shores is currently governed by the orders entered on September 11, 2002, November 20, 2007, and May 31, 2011 in the *Gautreaux* Litigation (the "Madden/Wells Orders"). Among other things, the Madden/Wells Orders expanded the North Kenwood Oakland Revitalizing area to include the Madden/Wells site and some of the area surrounding the site, and authorized the development of up to 850 non-elderly public housing units, consistent with the then master plan. CHA has adopted a new Master Plan for this development which calls for fewer total units than the original plan, including 750 non-elderly CHA units, of which 700 are to be built on-site and 50 in the nearby area (the "Oakwood Shores Master Plan"). The plan also contemplates the construction of 100 homeownership units for CHA eligible families that can be built on- or off-site. The site has been partially developed with non-elderly CHA units, elderly units, affordable rental units, market rate rental units, and for-sale units.

The parties agree that the redevelopment of the Madden/Wells site shall be completed as set forth below, notwithstanding any conflicting provisions in the Madden/Wells Orders, which conflicting provisions are hereby superseded and replaced.

11

**EXHIBIT A**

**A.    534 Pershing Road**

The CHA shall enter into binding written agreements providing for the completion or commencement of construction by March 31, 2020, of 20 non-elderly CHA units, 20 affordable units, and 20 market-rate rental units in a building to be located at 534 Pershing Road.

**B.    For-Sale Units to be developed simultaneously with 534 Pershing Road**

The CHA shall enter into binding written agreements providing for the completion or commencement of construction by June 30, 2020, of 25 for sale units at Oakwood Shores.

**C.    Plan and Timeline for Next Phase of Development**

The CHA shall commit to a timeline and detailed plan for the next phase of development at Oakwood Shores (following the 534 Pershing Road construction project) by June 30, 2020.

**D.    Development to be Consistent with Oakwood Shores Master Plan**

The CHA shall enter into binding written agreements by December 31, 2019 providing for the remaining development of Oakwood Shores. The agreement(s) shall include CHA's commitment to complete development of 750 non-elderly CHA units at Oakwood Shores and shall be consistent with the Oakwood Shores Master Plan. The CHA shall identify locations for the 50 non-elderly CHA units to be developed offsite and enter into binding written agreements providing for the development of such sites or before December 31, 2021.

**E.    Sale or Lease of Land**

If the CHA sells or enters into long-term leases for land in the Madden/Wells site, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or in the area governed by the Oakwood Shores Master Plan.

### F. Other Uses of Land/Residential Benefit

If the CHA sells or exchanges the land in the Madden/Wells site for a use other than housing, the CHA shall, in addition to applying funds as provided in Section X.E, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

## XI. Rockwell Gardens

The redevelopment of the site formerly known as Rockwell Gardens is currently governed by the "waiver" orders entered on August 5, 2003, August 22, 2005, July 21, 2010, and June 10, 2015 in the *Gautreaux* Litigation, authorizing redevelopment in various phases (1-A, 1-B, and 2) and also authorizing the development of a mixed income rental development at City Gardens, where Maplewood Courts once stood (the "Rockwell Garden Orders"). Although the units authorized by the Court for the Phase 1-A and City Gardens development have been completed, some of the units authorized for the Phase 1-B and Phase 2 developments have not yet been constructed.

The parties agree that the redevelopment of the Rockwell Gardens site shall be completed as set forth below, notwithstanding any conflicting provisions in the Rockwell Gardens Orders, which conflicting provisions are hereby superseded and replaced.

### A. Market Rate/For Sale Units

The CHA shall enter into binding written agreements providing for the construction of 35 market rate rental units or for sale units on the Phase 1-B and 2 sites on or before December 31, 2023.

13

**B.     New Master Plan**

The CHA shall, by December 31, 2020, create a new master plan providing for the development of the remaining vacant land on the Rockwell Gardens site, which plan shall provide for both housing and non-housing uses.

**C.     Future housing on site**

New housing on the Rockwell Gardens site shall be developed as mixed income housing. No more than 25 percent of such residential units shall be non-elderly CHA units.

**D.     Sale or Lease of Land**

If the CHA sells or enters into long-term leases for land on the Rockwell Gardens site, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or in the area governed by the new Rockwell master plan.

**E.     Other Uses of Land/Residential Benefit**

If the CHA sells or exchanges the land for a use other than housing, the CHA shall, in addition to applying funds as provided in Section XI.D, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

**F.     Security Plan for Vacant Land**

The CHA shall develop and implement a security plan for the vacant land on the Rockwell Gardens site.

**XII.   Stateway Gardens**

The redevelopment of the site formerly occupied by Stateway Gardens and now designated as the Stateway Revitalizing Area is currently governed by the orders entered on

14

December 16, 2003, November 22, 2005, May 31, 2011, May 31, 2012, and April 2, 2013 in the *Gautreaux* Litigation (the "Stateway Gardens Orders"). Among other things, the Stateway Gardens Orders authorized the development of the mixed income building known as The Pershing, established and expanded the Stateway Revitalizing Area, and provided for the phased development of Park Boulevard within the Stateway Revitalizing Area. Phases 1-A, 1-B, 2-A, and 2-B of the Park Boulevard development have been completed, and the planning for Phase 3 is currently underway. The Stateway Gardens Orders provide that the non-elderly CHA units shall constitute no more than 33% of the total housing units in the Stateway Revitalizing Area.

The parties agree that the redevelopment of the Stateway Gardens site shall be completed as set forth below, notwithstanding any conflicting any provisions in the Stateway Gardens Orders, which conflicting provisions are hereby superseded and replaced.

### A. Phase 3 Development of Park Boulevard

CHA shall enter into binding written agreements providing for the completion or commencement of construction by June 30, 2021, of 31 non-elderly CHA units, 51 affordable housing units, and 38 market-rate rental or for sale units in the Park Boulevard development.

### B. New Master Plan

The CHA shall, by December 31, 2021, create a revised master plan that includes development of additional Stateway Gardens replacement non-elderly CHA units within mixed income housing, as well as a park and an indoor community space (which can take the form of recreational space). The CHA shall enter into binding written agreements for the implementation of the revised master plan on or before December 31, 2022.

### C.   Future housing on site

New housing to be developed as Stateway Gardens replacement non-elderly CHA units under the new master plan shall be developed as mixed income housing, including no less than 30 percent and no more than 35 percent non-elderly CHA units.

### D.   Sale or Lease of Land

If the CHA sells or enters into long-term leases for land in the Stateway Gardens Revitalizing Area, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or in the area covered by the new Stateway Gardens master plan.

### E.   Other Uses of Land/Residential Benefit

If the CHA sells or exchanges the land for a use other than housing, the CHA shall, in addition to applying funds as provided in Section XII.D, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.


## XIII.   Robert Taylor Homes

The redevelopment of the site formerly known as the Robert Taylor Homes is governed primarily by the "waiver" orders entered on March 30, 2004, April 17, 2006, November 6, 2007, July 23, 2009, and February 26, 2014 in the *Gautreaux* Litigation (the "Robert Taylor Orders"). The Robert Taylor Orders authorize the development of 179 non-elderly CHA units on the site and in the neighborhood of the former Robert Taylor development, provided that they are built alongside 228 affordable housing units, 111 market-rate housing units, and 139 for-sale housing units. The CHA has developed all of the public housing, affordable and market-rate rental units that have been authorized by the Court. The for-sale units have not been constructed.

16

The parties agree that the redevelopment of the Robert Taylor Homes site shall be completed as set forth below, notwithstanding any conflicting any provisions in the Robert Taylor Orders, which conflicting provisions are hereby superseded and replaced.

**A.      Market Rate/For Sale Units**

The CHA shall, by December 31, 2021, enter into binding written agreements providing for the construction and completion of 139 market rate rental or for sale units at Savoy Square, Mahalia Place and/or Hansberry Square by December 31, 2023.

**B.      Future housing on site**

If the CHA approves and implements plans to construct additional housing on the Robert Taylor site, the new housing shall be developed as mixed income housing, including no less than 25 percent nor more than 30 percent non-elderly CHA units.

**C.      Sale or Lease of Land**

If the CHA sells or enters into long-term leases for land on the Robert Taylor site, the CHA shall use at least 50% of the funds received from such sale or lease to obtain CHA replacement units in General or Opportunity Areas throughout the City of Chicago or on the Robert Taylor site.

**D.      Other Uses of Land/Residential Benefit**

If the CHA sells or exchanges the land for a use other than housing, the CHA shall, in addition to applying funds as provided in Section XIII.C, secure a resident benefit agreement on behalf of CHA residents, providing for benefits in the form of employment, program participation, or other activities.

### XIV. Washington Park/4400 Grove

The redevelopment of the two Washington Park sites known as Shops & Lofts and 4400 Grove (at 45th Street and Cottage Grove) is currently governed by the order entered on October 30, 2012 in the *Gautreaux* Litigation (the "Washington Park Order"). Among other things, the Washington Park Order expanded the North Kenwood Oakland Revitalizing Area to include the two Washington Park Sites and authorized mixed-income developments on each site. The development at the Shop & Lofts site has been completed.

The parties agree that the redevelopment of the Washington Park/4400 Grove site shall be completed as set forth below, notwithstanding any conflicting any provisions in the Washington Park Order, which conflicting provisions are hereby superseded and replaced.

#### A. Phase 1

Phase 1 of the Washington Park/4400 Grove site is planned to be two mid-rise buildings with ground floor retail and a public plaza. It will contain 21 non-elderly CHA units, 38 affordable rental units, and 25 market rate rental units. CHA shall enter into binding written agreements providing for the completion or commencement of construction of Phase 1 on or before March 31, 2019.

#### B. Phase 2

Phase 2 of the Washington Park/4400 Grove site is planned to be low-rise buildings. CHA shall, by December 31, 2020, create a plan providing for the Phase 2 development of the site, including a maximum of 25% non-elderly CHA units. CHA shall enter into binding written agreements providing for the completion or commencement of construction of the Phase 2 development by December 31, 2021.

**EXHIBIT A**



EXHIBIT

B

**2018 CHA Opportunity Areas by Census Tract**

Opportunity Areas: Census tracts with less than 20% family poverty and less than 5% non-elderly subsidized housing saturation, or improving tracts with moderate neighborhood indicators

All other tracts that do not meet baseline criteria

Gautreaux Limited tracts

Chicago Community Areas

Area Interstate Highways

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

*A federal court authorized this notice.*
*This is not a solicitation from a lawyer.*

**TO:  ALL AFRICAN-AMERICAN INDIVIDUALS WHO LIVE IN PUBLIC HOUSING IN CHICAGO OR ARE APPLICANTS FOR PUBLIC HOUSING IN CHICAGO**

This notice is to inform you that the parties have proposed a settlement of a class action lawsuit involving allegations of discrimination against African-American individuals who live in public housing in Chicago or are applicants for public housing in Chicago. Please read this notice carefully and completely.

If you are a member of the class, the notice contains important information about your rights. *Your legal rights will be affected whether you act or don't act.*

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | CHA will move forward with its responsibilities and obligations under the settlement agreement (as described below in paragraph 4). Class Members will surrender their rights to sue the CHA for the specific discrimination claims in this case. |
| **OBJECT** | Write to the Court about why you do not believe the settlement is fair. |
| **GO TO A HEARING** | Ask to go to Court in Chicago and speak about the fairness of the settlement. |

## BASIC INFORMATION

### 1. What is the purpose of this notice?

The purpose of this notice is to inform you of the proposed settlement in a class action lawsuit brought on behalf of African-American tenants who live in or are applicants for public housing in Chicago. The settlement, which must be approved by the Court, was reached in connection with *Gautreaux v. Chicago Housing Authority, et al.*, 66-cv-1459 (N.D. Ill.).

### 2. What is this case about?

The original complaint in this lawsuit, which was filed in 1966, alleged that the policies of the Chicago Housing Authority ("CHA") with respect to the selection of sites for public housing and for the assignment of tenants were racially discriminatory and violated the class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Sections 1981 and 1983 of the Civil Rights Act of 1964. On March 2, 1967, the District Court

EXHIBIT

B

certified this case as a class action. On February 10, 1969, the District Court granted summary judgment in favor of the class, and found that the CHA had discriminated "by selecting housing project sites in predominantly black neighborhoods and by using racial quotas to limit the number of blacks in housing projects in predominantly white neighborhoods." The District Court then entered an order on July 1, 1969, "to prohibit the future use and to remedy the past effects of the defendant Chicago Housing Authority's unconstitutional site selection and tenant assignment procedures, . . . and, among other things, ordered CHA to affirmatively administer its public housing system in every respect ... to the end of disestablishing [its] segregated public housing system." That Order is known as the 1969 Judgment Order.

### 3. Why is there a settlement?

Over the ensuing years, the facts and circumstances that gave rise to the entry of the 1969 Judgment Order have changed significantly, and the parties to this litigation have worked cooperatively to advance the purposes of the Judgment Order and implement a desegregated public housing program. The parties agree now that, in view of the substantial change in circumstances that have occurred since entry of the 1969 Judgment Order, the 1969 Judgment Order should be vacated and replaced with a settlement agreement.

### 4. What does this settlement agreement provide?

The Settlement Agreement, a complete version of which may be found on the CHA's website at www.cha.org and on Class Counsel's website at www.bpichicago.org, provides that: (1) the CHA will complete a Development Plan that is attached as an exhibit to the Settlement Agreement; (2) the CHA will limit its development of non-elderly units unless, subject to certain exceptions, those units are in a General or Opportunity Area as those terms are defined in the Agreement; (3) the Class Counsel will have the right to propose reasonable changes to the way in which CHA administers its Housing Choice Voucher program; and (4) CHA will coordinate efforts to implement early learning program initiatives in conjunction with appropriate community partners, at its Dearborn, Lake Park Place/Washington Park, Trumbull and Wentworth public housing developments.

Under the terms of the Settlement Agreement, the 1969 Judgment Order will be terminated. The Settlement Agreement resolves all discrimination claims against Defendants. The Class Members will release, relinquish, and discharge all claims against the Defendants with respect to the discrimination claims brought by the Plaintiff in this action, and the Class Members will be permanently barred and enjoined from instituting, commencing, or prosecuting any such claims against the Defendants. The Settlement Agreement also provides for attorneys' fees to be awarded by the Court to Class Counsel for their work in connection with this Action and the monitoring and enforcement of the Settlement Agreement. The Agreement itself will terminate on July 31, 2024.

**5. How do I tell the Court that I don't like the settlement?**

You have the right to object to the terms of this settlement by filing a written, signed objection with the Court no later than January 15, 2019. Written objections must be filed with the Clerk of the United States District Court for the Northern District of Illinois at the following address:

> Clerk of the United States District Court Northern District of Illinois
> Everett McKinley Dirksen United States Courthouse
> 219 S. Dearborn Street
> Chicago, IL 60604

> Specifying: *Gautreaux v. Chicago Housing Authority, et al.*, 66-cv-1459

Objections may be filed in person or may be mailed to the Court at the above address but must be actually received by the Court by the deadline set forth above to be considered. Copies of objections must also be mailed or delivered to counsel for the Parties:

> Alexander L. Polikoff
> Julie Elena Brown
> Business & Professional People for the Public Interest
> 25 East Washington Street
> Suite 1515
> Chicago, IL 60602

> James L Bebley
> General Counsel
> Chicago Housing Authority
> 60 E. Van Buren
> Chicago, IL 60605

> Thomas Edward Johnson
> Johnson, Jones, Snelling & Gilbert
> 36 South Wabash Street
> Suite 1310
> Chicago, IL 60603

**6. When and where will the Court decide whether to approve the settlement?**

A hearing will be held in Room 2568 of the United States Courthouse, 219 South Dearborn Street, Chicago Illinois, at 11:00am on January 17, 2019, for determining whether the Court should

give its final approval to the Settlement Agreement. Class Members are welcome to attend the hearing, at their own expense, and they may request permission to speak to the Court. Class Members may also hire their own lawyers at their own expense to speak on their behalf. If Class Members have sent a written objection, they do not need to come to Court. If the Class Member's objection was postmarked on time, the Court will consider it.

7. **Do I need to come to the hearing?**

No. But if a Class Member wants to speak at the hearing, she or he must ask the Court for permission. To do so, file a request with the Court by mail with the Clerk of the United States District Court for the Northern District of Illinois at the address listed above, and mail copies to Mr. Polikoff, Ms. Brown, Mr. Bebley, and Mr. Johnson at the addresses listed above, requesting permission to speak at the settlement approval hearing in the case of *Gautreaux v. Chicago Housing Authority, et al.*, 66-cv-1459. The request should state the Class Member's position and the basis for that position. The request for permission to speak must be filed with the Court prior to 3:00pm on January 15, 2019. The Court may, or may not, grant the request.

8. **Do I have a lawyer in this case?**

The Class Members are represented by Alexander Polikoff and Julie Elena Brown of Business & Professional People for the Public Interest, 25 East Washington Street, Suite 1515, Chicago, IL 60602.

9. **How will the lawyers be paid?**

Class Counsel will petition the Court for attorneys' fees.

10. **Who should I contact if I have any questions?**

If you have any questions about the settlement, contact Alexander Polikoff or Julie Elena Brown at BPI. **DO NOT CALL OR WRITE THE COURT TO OBTAIN COPIES OF DOCUMENTS OR TO ASK QUESTIONS ABOUT THE SETTLEMENT.**


Dated: _____, ____                                        _____

                                                           Hon. Marvin E. Aspen
                                                           United States District Court