IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOROTHY GAUTREAUX, ET AL, ) | |
| MAISHA IMANI HAMILTON, on behalf of herself ) | |
| and others who are similarly situated ) | Case Number: 66 C 1459 |
| ) | Consolidated w/ 66 C 1460 |
| Plaintiffs, ) | |
| vs. ) | |
| ) | Hon. Jorge Alonso |
| UNITED STATES DEPARTMENT OF HOUSING ) | |
| & URBAN DEVELOPMENT, CITY OF CHICAGO, ) | Re: Emergency Motion |
| CHICAGO HOUSING AUTHORITY, MICHAEL ) | |
| HARRIS, THERESA DENT, DAVITA HEARD ) | Room 1903 |
| Defendants. ) | |
| ) | |

**EMERGENCY MOTION FOR EMERGENCY TRANSFER FROM CHA PUBLIC HOUSING WHERE PLAINTIFF LIVES IN CONSTANT FEAR FOR HER LIFE AND SAFETY AND THE SECURITY OF HER PROPERTY TO A MIXED-FINANCED DEVELOPMENT ON THE NORTH SIDE, A GAUTREAUX GOAL**

NOW COMES Plaintiff, Maisha Imani Hamilton, Ph.D., proceeding pro se, to move this court to order Chicago Housing Authority (hereinafter "CHA") to transfer her without delay out of Vivian Gordon Harsh Apartments (hereinafter "Harsh Apts") to a safe and secure mixed finance mixed-income development in a predominantly white neighborhood on the north side of Chicago, which complies with *Gautreaux* goals, and into housing where Plaintiff would be secure in her person, house, papers, and effects against unreasonable searches and seizures, as guaranteed by the 4th Amendment, and where Plaintiff would not be deprived of life, liberty, or property without due process of law, as guaranteed by 14th Amendment, and in support thereof Plaintiff states as follows:

1. This motion is an emergency due to the fact that Plaintiff lives in constant fear that CHA, either through malice or through willful and wanton negligence, will cause

Plaintiff to be killed by carbon monoxide poisoning consequent to CHA either knowingly giving access to Plaintiff's apartment to one or more persons who wish to harm or kill Plaintiff, and/or consequent to CHA ignoring unlawful entries by one or more persons into Plaintiff's apartment, who thereby acquired access to Plaintiff's gas stove therein during one or more times that Plaintiff was absent from home.

    2. On July 16, 2019, Plaintiff left home for an unknown period of time. When she returned home, Plaintiff sat in a chair in front of her desktop computer, which is stationed between her kitchen and living room and 30 inches away from the gas stove. Shortly after sitting in that area, Plaintiff smelled gas, and she immediately called the Chicago Fire Department and reported a gas leak. The Fire Department came to Plaintiff's apartment and examined the premises, including the gas stove. The Fire Department did not tell Plaintiff that she had a gas leak and did not give Plaintiff any written report. Later, Plaintiff learned that the Fire Department had referred Plaintiff's situation to Peoples Gas for further assistance.

    3. On July 16, 2017, soon after the Fire Department left, two Peoples Gas technicians arrived. They examined the stove and wrote in their report, "Have contractor service unit, flexible connector is leaking. Also oven ignitor is weak. Rear right burner needs cleaning. Safety check operation." Said report is attached hereto as **EXHIBIT 1** and incorporated herein by reference thereto.

    4. On July 16, 2019, Plaintiff learned that while she was away from home on July 16th, and/or on one or more other days, and while her apartment door should have been locked due to the fact that Plaintiff locked her door with her key every time she left home, the flexible connector, which can only be reached by pulling the stove out from the wall, had been punctured, and natural gas and carbon monoxide had been leaking

into Plaintiff's apartment for an unknown period of time, and said gases had potentially permanently damaged Plaintiff's brain, heart, and lungs before being discovered on July 16, 2019. To this date Plaintiff has not sought diagnosis of and treatment for carbon monoxide poisoning.

      5.   On approximately June 12, 2015, at the time that Plaintiff moved into her CHA apartment, a brand-new gas stove was installed therein. An aluminum flexible connector supplied natural gas to the stove. According to a Peoples Gas technician, the life of a brand-new flexible connector is 30 years. Upon information and belief, Plaintiff was the first and only person to use the stove, which was replaced on approximately July 17,2019, after only four years of infrequent use because Plaintiff is primarily a raw foodist who only used her stove occasionally.

      6.   On July 17, 2019 CHA installed a brand-new stove in Plaintiff's apartment. However, every time Plaintiff leaves home, she fears that CHA management will permit someone, such as Chicago police personne, to enter her apartment and puncture the flexible connector on the stove and cause a new gas leak to poison the air in Plaintiff's apartment and her body.

      7.   On September 22, 2019, Plaintiff felt anxious about the possibility of a gas leak in her apartment, and called Peoples Gas to come to her apartment to examine her stove, and the technicians came on the same day that Plaintiff called and examined the stove in her apartment. The technicians did not find any gas leak from Plaintiff's stove on that date.

      8.   Plaintiff pulled out her July 16, 2019 gas leak report **[EXHIBIT 1]** and showed it to the technicians who came to her apartment on September 22, 2019 and asked questions about the leaking stove that was the subject of said report. Plaintiff

3

understood the technicians to say that the life of a flexible connector is 30 years, that on July 16, 2019, Plaintiff's flexible connector had been found to have been punctured, that the puncture to the flexible connector had caused the gas leak, that there was no innocent explanation for the gas leak, and it could not be explained by ordinary wear and tear on a stationary 4-year old appliance with a 30-year life, and that it would take rough movement of the stove back and forth and repeatedly bumping it into something sharp or blunt to cause a puncture, and that the puncture to the flexible connector could possibly be explained by someone willfully and deliberately pulling the stove out from the wall and willfully and deliberately puncturing the flexible connector.

  9. On September 23, 2019 a Peoples Gas customer service representative called Plaintiff, and stated, inter alia, that gas could have been leaking from the stove for an undeterminable period of time before Plaintiff smelled gas due to the fact that Plaintiff lives across from the lake and a breeze comes in thru her windows when they are open and the breeze could dilute the smell of leaking gas, and that Plaintiff might want to consider seeking a medical evaluation to determine whether or not she is suffering from any signs or symptoms of carbon monoxide poisoning, and that Peoples Gas reports are written in such a way as to be helpful to law enforcement if a customer suspects foul play.

  10. Article by thoughtco.com: *What Is Carbon Monoxide Poisoning? The Silent Killer*, written by Anne Marie Helmenstine, Ph.D. Updated January 24, 2018, states: "Carbon monoxide (or CO) is an odorless, tasteless, invisible gas that is sometimes called the silent killer because it poisons and kills people each year, without them ever being aware of the danger.

  11. "<u>How Carbon Monoxide Kills You</u>**.** When you breathe in carbon monoxide, it enters your lungs and binds to the hemoglobin in your red blood cells. The problem is that hemoglobin

4

binds to carbon monoxide over oxygen, so as the level of carbon monoxide increases, the amount of oxygen your blood carries to your cells decreases. This leads to oxygen starvation or hypoxia.

12. "At low concentrations, the symptoms of carbon monoxide poisoning resemble the flu: including headaches, nausea, and fatigue. Continued exposure or higher concentrations can lead to confusion, <u>dizziness</u>, <u>weakness</u>, drowsiness, severe headache, and <u>fainting</u>. If the brain doesn't get enough oxygen, carbon monoxide exposure can lead to unconsciousness, coma, permanent brain damage, and death.

13. "The effects can become deadly within minutes, but long-term low-level exposure is not uncommon and leads to organ damage, disease, and a slower death. Long-term exposure can lead to neurological and circulatory system damage, even when the levels aren't high enough to produce a significant effect in adults.

14. Beginning in approximately 2017, after Theresa Dent became the site-manager at Harsh Apts, Plaintiff noticed that she experienced frequent headaches and some were severe, and that she was often drowsy and fatigued, and that she found herself dozing off while sitting in her chair. Plaintiff is also aware of numerous periods of confusion, and of feeling faint, although not actually fainting, and of transient weakness in various parts of her body.

15. Plaintiff called the poison hotline numerous times during the past two to three years, and her symptoms always seemed to include headaches. Upon information and belief, the hotline operators would not accept headaches as the sole, and maybe not even as the primary symptom of poisoning without also hearing symptoms of stomach ache, diarrhea, constipation, and the like to diagnose poisoning, and poison hotline operators never suggested to Plaintiff that she might be suffering from carbon monoxide poisoning.

5

16. When the operator asked why she thought she might have been poisoned, Plaintiff would typically say that she was living in a situation where the building management appeared to be indifferent to health, safety, clean air, enforcing the no-smoking policy and the like, and that the Chicago police, the so-called CHA police and ambassadors seemed to wish Plaintiff evil. Thus, whenever Plaintiff left her apartment and left any food opened and unattended, Plaintiff would fear it had been contaminated or even poisoned, and she would not eat it.

17. Moreover, upon information and belief, Ms. Dent had a willingness and perhaps even a policy of giving Chicago police, CHA police and ambassadors access to Plaintiff's premises any time the police made such a request of her.

18. Plaintiff signed a lease for an apartment in CHA's Vivian Gordon Harsh Apartments in June 2015, and moved into the apartment on a date in early July 2015.

19. CHA issued a door key to Plaintiff to her apartment, which was stamped with the words, "Do Not Duplicate" and CHA represented to Plaintiff that CHA management retained custody of all duplicate keys and master keys that could provide access to Plaintiff's unit, and Plaintiff, a reasonable person, concluded that the only way a person could gain entry into Plaintiff's unit would be for Plaintiff to let the person in or give the person her key to use to get in, or for CHA staff or agents to let the person in or give the person a key to use to get in, or for a person to forcibly break into and enter the unit. CHA became liable for any and every entry that was not made by Plaintiff or by a person who was entering with Plaintiff's consent or by forcible entry.

20. In the four years and four months that Plaintiff has lived in unit 1108, she has always, 100% of the time, unlocked her door personally, and has never given her key to anyone else to use to unlock her door. Plaintiff has given her consent to management,

on one or more occasions to provide entrance to the exterminator and other maintenance personnel to enter unit 1108.

21. Upon information and belief, during the four years and four months that Plaintiff has lived in Harsh Apts., she has been the victim of dozens upon dozens of warrantless searches and seizures of her legal papers and personal property during both long and short absences from her premises. CHA controls duplicate and master keys to Plaintiff's premises, and upon information and belief, CHA has knowledge of said searches and seizures, and may have provided access to Chicago police and/or CHA-paid so-called CHA police, and/or CHA-paid so-called CHA ambassadors. There has never been any sign of forcible entry into Plaintiff's apartment.

22. On a date in July 2019, Plaintiff requested that her locks be changed. On August 10, 2019, a CHA maintenance worker changed the locks on her door. The key to the new lock was not stamped with the words, "Do Not Duplicate."

23. On August 25, 2019, after locking her door from the inside, Plaintiff sat down in front of her desktop computer, stationed approximately 18 feet from the entrance door to her apartment. At 3:16 p.m., Plaintiff heard someone turn a key in the lock on her door. At first Plaintiff froze in fear. Then she rushed to the door and looked thru the peephole to see if she could see the person who had opened the lock on her door, however, the would-be intruder had walked away and could not be seen. Plaintiff noticed that the key that the unknown person had used, had successfully unlocked her door. Plaintiff's key at this time did not have the words, "Do not duplicate" stamped on it, however, CHA management represented that Plaintiff and management were the only persons with access to the key to Plaintiff's premises. Plaintiff reported this incident to management and requested a copy of the surveillance video footage and an investigation

into unlawful entries into Plaintiff's apartment. Hpwever, to this date, more than a month later, CHA management has failed to give Plaintiff any feedback about the persons involved in attempted entry to her apartment.

24. A few days later, on an unknown date in late August or early September 2019, after locking her door from the inside, Plaintiff sat down in front of her desktop computer, stationed approximately 18 feet from the entrance door to her apartment. At an unknown time, Plaintiff heard someone turn a key in the lock on her door. Plaintiff rushed to the door and looked thru the peephole, however, the would-be intruder had walked away and could not be seen. Plaintiff noticed that the key that the unknown person had used, had successfully unlocked her door. Plaintiff's key at this time did not have the words, "Do not duplicate" stamped on it.

25. On an unknown date between the end of August 2019 and September 2, 2019, Plaintiff requested that CHA would give her a new lock and a new key that was stamped with the words, "Do not duplicate" on the face of the key. On September 3, 2019, CHA management sent the maintenance worker to Plaintiff's unit to change the lock on her door and to give Plaintiff a key to her door that was stamped, "Do not duplicate."

26. Although Plaintiff has never in four years and four months of living in this CHA development been able to protect her person, house, papers, or effects from warrantless searches and seizures of Plaintiff's , she did not acquire witnesses until September 18, 2019 to the fact that CHA was both blameworthy and liable for warrantless searches and seizures of Plaintiff's person, house, papers, and effects, Plaintiff has finally acquired two witnesses to CHA's violations of her 4th amendment rights. Affidavits from Plaintiff's witnesses, Phyllis Unruh and Clayton Unruh, are

attached hereto as **Exhibit 2** and **Exhibit 3** and incorporated herein by reference thereto.

27. Evidence of each unconstitutional entry into and exit from Plaintiff's unit should be available by viewing of the surveillance videotapes that CHA maintains for one or more housing developments, including Harsh Apts. Plaintiff has reviewed approximately 4 to 5 surveillance tape, and has possession of copies of two or three tapes, which might constitute evidence of CHA's violations of the 4th amendment. Said tapes were seized during one or more unlawful entries into Plaintiff's apartment, and the tapes may have been erased by now. However the original tapes should still be available and CHA must be enjoined from erasing or tampering with any original CHA surveillance tapes

28. On September 18, 2019, Plaintiff was accompanied by Phyllis Unruh and her husband, Clayton Unruh, when she left her apartment at approximately 11:50 a.m. Each of the Unruh's witnessed Plaintiff use her key, which was marked "Do not duplicate" to lock her apartment door, and afterward, the three of them left the building together. After turning the key in the lock, Plaintiff pressed down on door handle to make sure the door was locked.

29. Plaintiff, Phyllis Unruh and Clayton Unruh returned to Plaintiff's building at approximately 5:30 p.m. the same day. When the three of them approached Plaintiff's door, they saw that the door was not locked and was standing ajar.

30. On September 25, 2019, Plaintiff was accompanied by Phyllis Unruh and her husband, Clayton Unruh, when she left her apartment at approximately 8:30 a.m. Each of the Unruh's witnessed Plaintiff use her key, which was marked "Do not duplicate" to lock the door to Plaintiff's apartment. After turning the key in the lock, Plaintiff pressed

9

down on door handle to make sure the door was locked. Afterwards, the three of them left the building together.

31. Among doing other things, Plaintiff went to Judge Alonso's courtroom and talked with Lesley Fairley, his courtroom deputy about scheduling instant emergency motion. Plaintiff was accompanied by Phyllis Unruh and Clayton Unruh.

32. At approximately 5:30 p.m., Plaintiff rode with the Unruh's in their SUV back to her building. Phyllis accompanied Plaintiff in the elevator up to her apartment. Plaintiff unlocked the door and Plaintiff and Phyllis entered Plaintiff's apartment. In a cursory look around, Plaintiff discovered that the power cord to her desktop computer was not attached to her computer and could not be found anywhere in Plaintiff's apartment. Phyllis observed that Plaintiff's computer power cord was not attached to her computer and offered to write an affidavit to that effect.

33. Plaintiff took the elevator downstairs to the CHA management office, and told Theresa Dent, a person with supervisory responsibility for Harsh Apts, that the power cord to her computer had been removed from her apartment. By the time Plaintiff took the elevator back to the 11th floor and walked to her unit, and went inside, she saw that the power cord had been returned and was attached to the computer and plugged into an electrical outlet.

34. There is the appearance that CHA has been violating not only Plaintiff's constitutional rights under the fourth and fourteenth amendments but also her civil rights, pursuant to 42 U.S. Codes 1981, 1982, 1983, 1985, and 1986, civil statutes, and 18 USC 241 and/or 18 USC 242. - criminal statutes.

35. 18 USC §241. Conspiracy Against Rights

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
>
> They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, ...or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

36. The City of Chicago's Police Department has conspired with Chicago Housing Authority, and its employees and agents to injure, oppress, threaten, and intimidate Plaintiff in the free exercise and enjoyment of her right to be secure in her person, house, papers, and effects against unreasonable searches and seizures, as secured to her by the Constitution and laws of the United States, and her right not be deprived of life, liberty, or property without due process of law, as secured to her by the Constitution and laws of the United States.

RELIEF REQUESTED

Whereas CHA is unable and/or unwilling to protect Plaintiff's life, health, and safety, and whereas the Chicago Police Department may be actively attempting to injure or even kill Plaintiff....

Therefore, Plaintiff is requesting a transfer from Harsh Apts. to a mixed-finance, mixed income apartment instantly. Upon information and belief, Michael Harris and/or Charles Hicks, both CHA Portfolio managers, are already looking for a mixed-income

11

apartment for Plaintiff to transfer to. Plaintiff would only accept a one-bedroom low-income apartment in a mixed-finance building, if available, and if not available then she would accept a one-bedroom market rate apartment, and if not available then she would accept a two-bedroom low-income apartment in a mixed-finance building, if available, and if not available then she would accept a two-bedroom market rate apartment, and if not available then she would accept a one or two bedroom furnished apartment in a location of Plaintiff's choice to which she could move immediately and where she could stay while she is waiting for her mixed finance apartment to be made ready.

Moreover, CHA would absorb any cost of housing for Plaintiff Hamilton that is greater than 30% of Plaintiff's monthly income, and would pay all relocation expenses.

Respectively Submitted,

*/s/Maisha I. Hamilton*

Maisha I. Hamilton

Plaintiff

P.O. Box 4734

Chicago, IL 60680

Telephone: 773-243-9619

Proseme1@aol.com